IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


PAUL R. HENRY,                          )
                                        )
                Plaintiff,              )          Civil Action No. 09-751
                                        )
        v.                              )
                                        )
NORTHERN WESTMORELAND                   )
CAREER & TECH,                          )
                                        )
                Defendant.              )

## MEMORANDUM OPINION

CONTI, District Judge.

On June, 11, 2009, plaintiff Paul Henry ("Henry" or "plaintiff") commenced this lawsuit

by filing a complaint against defendant Northern Westmoreland Career & Tech ("NWCT" or

"defendant"). (ECF No. 1.) Henry asserts two claims against NWCT relating to his termination

from employment in June 2008 in a reduction in force ("RIF") context: (1) employment

discrimination based upon age under the Age Discrimination in Employment Act, 29 U.S.C. §§

621 *et seq.* ("ADEA"); and (2) employment discrimination based upon sex pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). Pending before the

court is a motion for summary judgment (ECF No. 20) filed by NWCT. NWCT's motion

requests the court grant summary judgment in its favor with respect to all plaintiff's claims.

After considering NWCT's motion for summary judgment and the submissions of the

parties, including the combined concise statement of material facts ("C.S.") (ECF No. 42),

NWCT's motion will be granted in its entirety because plaintiff failed to adduce sufficient

evidence to show that in reducing its force, the employer retained a sufficiently younger person

or someone outside plaintiff's class who was similarly situated.

1

## I. Factual background

### A. Northern Westmoreland Career & Tech

NWCT is a vocational school that draws students from four area school districts: (1) Kiski Area; (2) Burrell; (3) New Kensington-Arnold; and (3) Franklin Regional. (C.S. ¶¶ 9, 20.) NWCT's governing body is the Joint Operating Committee ("JOC"), which is comprised of two members from each school district. (Id. ¶ 10.) NWCT, as well as other vocational schools, receives Federal Perkins Loan Program ("Perkins") funds. (Id. ¶ 20.) NWCT's budget must be approved by the JOC and each school district's board. (Id. ¶ 21.)

Kurt Kiefer ("Kiefer") is the current director of NWCT and has held that position since November 2007. (Id. ¶ 11.) Kiefer was the director of NWCT when plaintiff's position was terminated. (Id. ¶ 12.) Kiefer's duties and responsibilities include the day-to-day running of the school, working on the budget, curriculum, disciplining students and other administrative tasks. (Id. ¶ 13.)

Coleen Steim ("Steim") is the business manager for NWCT and has held that position since 2003. (Id. ¶ 14.) Kiefer and Steim work on NWCT's budget together. (Id. ¶ 15.) Kiefer allocates the budget line items to certain expenditures and Steim reviews those decisions to ensure that they are permitted by specific regulations, including Perkins. (Id.) Steim also makes recommendations to Kiefer with regard to the budget. (Id. ¶ 16.) For example, if Kiefer allotted Perkins funding for advertising, Steim would review that decision to make sure that the allocation did not exceed NWCT's expenditures for that particular area. (Id. ¶ 17.) Kiefer testified that he could not recall whether Steim made suggestions to him about ways in which NWCT could save money. (Id. ¶ 18.) In the spring or summer of 2005, Steim recommended to

the JOC to eliminate Henry's position and outsource the duties he performed in that position. (Pl.'s App. (ECF No. 40), Ex. B at 3; C.S. ¶ 28.) NWCT disputes that Steim offered input into reaching the conclusion to terminate plaintiff's position with respect to the JOC's executive session on June 19, 2008, and asserts that "[Kiefer] put [the termination] in front of the eight-member board on [his] own." (C.S. ¶ 19; Def.'s App. (ECF No. 23), Ex. D ("Kiefer Dep.") at 15-16; Ex. E ("Steim Decl.") ¶¶ 4-6.)

### B. Plaintiff's employment and the technology service coordinator position

Henry was initially employed with NWCT as a permanent, part-time teacher's aide in electronics for the 2002-2003 school year, with no benefits, at an eleven-dollar-per-hour rate, six hours per day, for a maximum of 181 days per year. (C.S. ¶ 22.) Henry remained in that position until February 2004. (Id. ¶ 23.) In February 2004, plaintiff was asked to perform specific technology duties previously performed by two NWCT employees on a part-time basis. (Id. ¶ 24.) On or about June 22, 2004, the JOC approved the technology service coordinator ("TSC") position and job description, and on August 19, 2004, approved plaintiff's employment contract for the position. (Id. ¶¶ 25-26.) Plaintiff was sixty-four-years-old at the time he entered into the employment contract. (Id. ¶ 27.) The duties of the TSC position included handling software and hardware services for computers and printers, such as loading software and correcting hardware problems. (Id. ¶ 34; Def.'s App., Ex. B ("Henry Dep.") at 26-27.) NWCT renewed plaintiff's one-year contract for the TSC position in the 2005-2006, 2006-2007, and 2007-2008 school years. (Id. ¶ 29.) At the time the 2007-2008 school-year contract was up for renewal, plaintiff was sixty-seven-years-old. (Id. ¶ 33.)

### C. Termination

NWCT never subjected plaintiff to any disciplinary action during his employment as a TSC. (Henry Dep. at 51-52.) Kiefer did not recall plaintiff having any performance or disciplinary issues during Kiefer's time as director of NWCT. (C.S. ¶ 35.)

June 19, 2008 was Henry's last day of work for the 2007-2008 school year. (Id. ¶ 36.) Kiefer told Henry at a meeting on June 19, 2008, "Your first day back will be August 4th." (Henry Dep. at 104.) Plaintiff contends Kiefer provided explicit details about the upcoming school year, including anticipated work on twenty-five new computers for business classes and the installation of six new software programs. (Pl.'s App., Ex. A ("Henry Aff.") ¶ 14.)[1] Plaintiff talked to Kiefer in July 2008 following the termination and Kiefer admitted he did not know Henry would be terminated until the JOC meeting on the evening of June 19, 2008, and that he had no control over the decision to terminate plaintiff's position. (Henry Aff. ¶ 16.)[2] Kiefer testified that he met with Henry on Henry's last day of work,[3] and knew he was going to recommend to the JOC to terminate the TSC position. (C.S. ¶ 37; Kiefer Dep. at 18-19.) Kiefer, however, did not advise Henry of his intention at that meeting. (Id.) Plaintiff disputes that Kiefer intended to recommend termination. Kiefer testified he did not tell plaintiff about the

---

[1] NWCT argues the portion of plaintiff's affidavit pertaining to the June 19, 2008 meeting contradicts his deposition testimony and should be excluded from the record pursuant to Federal Rule of Civil Procedure 30(e) ("Rule 30(e)"). The Court of Appeals for the Third Circuit opined recently that "[a]s a general proposition, a party may not generate from whole cloth a genuine issue of material fact (or eliminate the same) simply by re-tailoring sworn deposition testimony to his or her satisfaction." EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 267-68 (3d Cir. 2010). In the summary judgment context, "a district court does not abuse its discretion under Rule 30(e) when it refuses to consider proposed substantive changes that materially contradict prior deposition testimony, if the party proffering the changes fails to provide sufficient justification." Id. at 268. Here, plaintiff's affidavit does not materially contradict his deposition testimony; rather, he expands on his discussion with Kiefer during the meeting and the reasons for his August 4, 2008 start date. Plaintiff requested a start date at the beginning of August, explaining, "I need to do this work. I am getting these computers set up for the students . . . ." (Henry Dep. at 104.) Reading the testimony in conjunction with plaintiff's affidavit, there is no apparent contradiction because Henry's statements concerning "*these* computers" and "*this* work" may have referred to the twenty-five new computers and six new software programs that were discussed at the meeting. See Baer v. Chase, 392 F.3d 609, 625 (3d Cir. 2004) (affidavit is not a "sham" when it does not "claim to raise a new or distinct matter, but rather explain[s] [a] certain aspect of . . . deposition testimony that cause[s] confusion").
[2] Plaintiff's statement is controverted by Kiefer's testimony explaining that, after the JOC terminated plaintiff's position, Kiefer took full responsibility with respect to the recommendation. (See Kiefer Dep. at 18-21.)
[3] Kiefer's deposition testimony indicates he met with Henry on June 18, 2008. (See Kiefer Dep. at 18-19; but see Henry Dep. at 104.)

recommendation during their meeting because that was the first time he recommended

terminating a position and he did not know how to handle the situation.  (C.S. ¶ 39.)

On June 19, 2008, Kiefer recommended, and the JOC unanimously approved the

elimination of the TSC position.  (Id. ¶ 44.)  Plaintiff was sixty-eight-years-old at the time his

employment was terminated.  (Id. ¶ 45.)  On June 20, 2008, plaintiff received notice of the JOC's

decision in a letter from Kiefer.  (Id. ¶ 46.)  Kiefer considered eliminating secretarial or custodial

staff, but declined to eliminate those positions because the office staff was already undermanned

and there was not enough time to hire an outside agency to take over the custodial duties.  (Id. ¶¶

54-56.)  Kiefer testified, and plaintiff disputes, that the TSC position was eliminated for solely

economic purposes and that plaintiff's age did not influence Kiefer's decision.  (Id. ¶¶ 57-58.)

NWCT asserts, and plaintiff denies, that Kiefer advised plaintiff if the school ever received

sufficient funds to open the TSC position again, Kiefer would hire plaintiff.  (Id. ¶ 59.)  The TSC

position was never reinstated and no one was hired to fill the duties of that position.  (Id. ¶ 60.)

After the elimination of the position, NWCT outsourced technology services to various

companies, including the IU, CCL Technologies, and Computer Connections.  (Id. ¶ 61)[4]

### D. Perkins funding

In late May 2008, Kiefer learned that NWCT's Perkins funding would be reduced

approximately $16,000 compared to the previous school year.  (Id. ¶ 47.)   Henry's salary,

unlike teacher salaries, was not paid directly out of Perkins funds, but Kiefer testified that the

cost savings from cutting the TSC position could be diverted to cover the Perkins funds'

shortfall.  (Id. ¶ 50; Kiefer Dep. at 8-9.)[5]  After learning about the decrease in Perkins funding,

---

[4] Outsourcing of technology services also occurred prior to Henry's termination.  (C.S. ¶ 61.)
[5] Plaintiff asserts Perkins grant money cannot be used to pay teacher salaries.  (Henry Aff. ¶ 24.)

Kiefer had less than one month to determine how to remedy the shortfall. (Id. ¶ 51.)[6] Kiefer testified that he selected plaintiff's position for termination in part because plaintiff did not directly affect the students, unlike a teacher's aide who would provide help to students with special needs. (Kiefer Dep. at 11-12.)[7] For the 2008-2009 school year the cost savings associated with the termination of the TSC position was approximately $2,000, which reflects Kiefer's assessment of the low end of the range for savings – $12,000 – reduced by the unemployment benefits – $10,000 – paid to Henry. (C.S. ¶ 62; Henry Aff. ¶ 20.)[8]

For the 2008-2009 school year, NWCT was mandated to hire a math teacher to assist with the Pennsylvania System of School Assessment testing that would result in an increase to NWCT's budget. (C.S. ¶ 48.) NWCT additionally hired three instructors to fill open positions vacated by individuals who were terminated for failing to meet state certification requirements. (Id. ¶ 70.)

### E. Steim's alleged acts of gender and age discrimination

Tim Redemer ("Redemer") has worked in NWCT's maintenance and custodial department for the past seven years. (Id. ¶ 72.) At the time of his deposition, Redemer was aware that his custodian position was not in the budget for the 2010-2011 school year. Redemer testified that, during a conversation with Steim about wages in the fall of 2005, she stated it was her opinion that "your wage is based on if you have a penis or not." (Id. ¶¶ 74, 76; Def.'s App.,

---

[6] Patrick Leyland "Leyland," a JOC member who voted to terminate plaintiff's position, stated in his affidavit that he never understood how eliminating the TSC position would save money. (Pl.'s App., Ex. B ("Leyland Aff.") at 4.) Leyland pointed to a portion of NWCT's 2007-2008 general operating budget, where the school budgeted $5,000 for seventy-five hours of contracted hardware and software support with the Westmoreland Intermediate Unit ("IU"). (Id., Attach. 1 at 2.) Leyland explained plaintiff's hourly rate was "well below" the rate charged by the IU. (Id. at 4.)
[7] Plaintiff contends that Leyland supported creating the position in 2004 because it addressed the increasing technology in NWCT classrooms. (Leyland Aff. at 2.)
[8] Kiefer recalled during his deposition that NWCT realized a cost savings of approximately $12,000 to $13,000 for the 2008-2009 school year by eliminating the TSC position. (C.S. ¶ 62.) Defendant clarifies those figures by explaining that the realized savings was actually between $14,000 and $18,000. (Id.)

Ex. G ("Redemer Dep.") at 6.)[9]  Redemer opined that, in the context of their conversation,

Steim's comment related to women not earning equal pay for equal work compared to their male

counterparts because of their gender.  (Redemer Dep. at 8.)  The only people present in the room

during the conversation were Redemer and Steim.  (C.S. ¶ 75.)  Redemer testified he did not

believe Steim discriminated against male employees and Steim's comment was the only occasion

he heard her make a gender-related statement.  (Id. ¶¶ 77, 79.)  No male employees of NWCT

complained to Redemer that Steim discriminated against them because of their gender.  (Id. ¶

80.)

Henry asserts that on or about September 13, 2007, Steim became hostile toward John

Tate, NWCT's former acting director, and him and accused them of calling her a liar.  (Id. ¶ 81.)

Henry alleges that during this incident, Steim said that Henry was getting "older" and

"forgetful."  (Id. ¶ 82.)  Other than that comment, plaintiff could not recall any specifics with

respect to other comments Steim made to him related to his age or gender.  (Id. ¶ 86.)  Henry

testified that other employees told him that Steim made comments, but could not provide

specifics because the employees were "vague in their references."  (Id. ¶ 90.)  Henry recalled an

occasion either in the latter part of the 2005-2006 school year or the first part of the 2006-2007

school year when Steim yelled across a room: "Mr. Henry, get over here."  (Id. ¶ 91.)  Henry

opined that Steim was speaking to him like a dog and that she used a demanding and sarcastic

tone, but did not recall why Steim needed him on that occasion.  (Id. ¶¶ 92-93.)

Plaintiff did not have daily contact with Steim.  (Id. ¶ 87.)  Plaintiff disputes that their

interactions were limited to her position as business manager and asserts that Steim, at times,

---

[9] Plaintiff testified that Steim made the comment to a co-worker, Mr. Dull, whom he believed was in the room with Redemer during the conversation.  Plaintiff stated in his affidavit that Steim made the comment to Redemer and that Redemer relayed the comment to plaintiff.  In any event, Redemer's testimony makes clear that the comment was made to him and not to Mr. Dull.  See Baer, 392 F.3d at 625 ("When there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit.").

exceeded her authority by acting as Henry's immediate supervisor. (Henry Aff. ¶ 11.) Plaintiff asserts Steim exceeded her authority in the following ways: (1) incorrectly performing Henry's computer duties, causing him inconvenience when he was required to fix her mistakes; (2) taking Henry's work orders and making mistakes with respect to those work orders which Steim requested Henry to fix; and (3) collecting software and equipment at the end of the 2004-2005 school year that plaintiff had to replace at the beginning of the 2005-2006 school year. (Id. ¶ 12; Leyland Aff. at 2.)

Plaintiff asserts Steim occasionally asked him in-depth questions about his work that he felt were harassing and demoralizing. (Henry Aff. ¶ 13; Henry Dep. at 62-63; C.S. ¶ 88.) For example, Steim asked plaintiff in an email dated January 4, 2006, how an issue with student log-ins had been resolved, and plaintiff thought that the question was unnecessary because she was not his immediate supervisor. (Def.'s App., Ex. C, Henry Dep. Ex. K; Henry Dep. at 172-73.) Any complaints plaintiff made to NWCT about Steim were limited to the following: (1) not being informed when an outside vendor was coming to NWCT to work on computers; (2) email; and (3) Edu-Net concerns. (C.S. ¶ 89.)

### F. Comparators

In May 2005, Steim and Welsh, a former director of NWCT, met with plaintiff and provided him a performance evaluation that listed "poor time management" as an area for improvement. (Id. ¶ 95; Henry Dep. at 38.) Steim and Welsh told plaintiff he was required to adhere to a strict schedule (arrive at 7:45 a.m., take lunch from 10:20 to 10:50 a.m., and leave at 3:15 p.m.). (Id.)[10] Plaintiff asserts that younger female employees, including "females in the office," were afforded variances in their schedule and could "go to lunch and come back any time they wanted to. Sometimes it was more than an hour that they were gone." (Henry Aff. ¶

---

[10] Henry's affidavit states he was required to take lunch between 10:50 a.m. and 11:20 a.m. (Henry Aff. ¶ 52.)

52; Henry Dep. at 39-40.) Plaintiff contends that, while he was required to maintain the same schedule under John Tate, a former director of NWCT, he was afforded greater flexibility until his performance review with Steim and Welsh. (Henry Aff. ¶ 53.)

NWCT asserts it is required by state law to have a certified assistant director. (C.S. ¶ 98.) In July 2008, NWCT hired Dr. Cynthia Shaw ("Shaw") to fill that position. (Id. ¶ 99.) Shaw and one other interviewee out of five interviewees possessed the proper certification for the position. (Id. ¶ 100.) NWCT considered Shaw to be the most qualified applicant for the position because she had administrative experience and the proper certification. (Id. ¶ 101.) The other candidate was a male and had the proper certification, but did not have administrative experience and requested a higher salary than Shaw. (Id. ¶ 103.) Robert Visk ("Visk"), dean of students at NWCT, was terminated because he did not possess the requisite certification for the assistant director position. (Id. ¶¶ 104, 106; Kiefer Dep. at 34-35.) Prior to his termination, Visk's salary was approximately $10,000 less than Shaw's starting salary. (Id. ¶¶ 102, 105.)

Plaintiff identified the following employees whom he alleges were treated less favorably by NWCT because of their age or gender: (1) Dave Wilson ("Wilson"), a male teacher over the age of forty who was discharged for lack of certification (Henry Dep. at 129; Henry Aff. ¶ 35); (2) Joe Henry, a male substitute teacher who applied for a one-year substitute marketing instructor position and a female was chosen for the position for higher pay than Joe Henry requested (Henry Dep. at 133-34); (3) John Sterosky, a male teacher over the age of forty who was discharged for lack of certification (Henry Dep. at 137-38; Henry Aff. ¶ 36); (4) Shawn Grissom, a male teacher over the age of forty who was terminated (Henry Dep. at 138; Henry Aff. ¶¶ 30, 36); (5) Ron Mangone, a male teacher over the age of forty who was discharged for poor work performance (Henry Dep. at 139-40; Henry Aff. ¶¶ 30, 36); (6) Sam Miller, a male

teacher over the age of forty who requested a pay increase and then left his position after NWCT advised him it could not afford to give him a raise (Henry Dep. at 142-43; Henry Aff. ¶¶ 30, 36); and (7) Visk, who was replaced by Shaw.

Plaintiff identified the following employees whom he alleges were treated more favorably by NWCT because of their age or gender: (1) Marnice Liput, a female, received the one-year substitute marketing instructor position over Joe Henry (Henry Dep. at 146); (2) Linda Slanicka, a female teacher, was permitted to attend training classes that plaintiff could not (Henry Aff. ¶ 39); (3) Jill Awes, a female business liaison, received more flexibility with respect to her schedule (Henry Dep. at 146-48; Henry Aff. ¶ 40); (4) George Varre, a younger male teacher, replaced Wilson (Henry Dep. at 148; Henry Aff. ¶ 41); (5) Darlene Butera, a younger female teacher, received assistance and resources plaintiff did not (Henry Dep. at 150-51; Henry Aff. ¶ 42); (6) William Schweikert, a culinary aide, with whom Steim got along better than plaintiff (Henry Dep. at 151); (7) Mary Roncher, a female medical instructor, received resources plaintiff did not (Henry Dep. at 151-52); (8) Carol Casey, a younger female cosmetology instructor, received a wireless connection and resources that plaintiff asked for but did not receive (Henry Dep. at 151-52; Henry Aff. ¶ 45); (9) Loretta Knee, a younger female office employee, received resources, such as a hard-drive, when plaintiff was denied similar resources (Henry Dep. at 153; Henry Aff. ¶ 46); (10) Ruth Simpson, a female "front office" employee, was provided a more flexible schedule than plaintiff (Henry Dep. at 153-54; Henry Aff. ¶ 47)[11]; (11) Elaine Link, a female "front office" employee, was provided a more flexible schedule than plaintiff (Henry Dep. at 154; Henry Aff. ¶ 48); (12) Jennifer Nix, a computer applications teacher, was provided parts pursuant to a work order request when plaintiff was denied similar

---

[11] Plaintiff admitted during his deposition that the "office" staff maintained a different schedule – their work day started earlier and ended later. (Henry Dep. at 147.)

requested resources (Henry Dep. at 154; Henry Aff. ¶ 49); and (13) Yvonne Sabattini, a female teacher, requested and was provided a CD burner within days of her request and plaintiff did not receive a CD burner after making a similar request for over one month (Henry Dep. at 155; Henry Aff. ¶ 51).

## *II. Standard of review*

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof
at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A

genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could

rationally find in favor of the non-moving party in light of his burden of proof.") (citing

Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

"[W]hen the moving party has carried its burden under Rule 56(c),
its opponent must do more than simply show that there is some
metaphysical doubt as to the material facts . . . . Where the record
taken as a whole could not lead a rational trier of fact to find for
the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most

favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts

in favor of the nonmoving party. Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129,

130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v.

Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility

determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc.,

142 F.3d 639, 643 n.3 (3d Cir. 1998).


*III. Discussion*

12

## A. Discrimination claims under the ADEA and Title VII

## 1. ADEA

To succeed on an age-based discrimination claim, a plaintiff must demonstrate that his or her age "was the 'but-for' cause of the employer's adverse decision," Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2351 (2009), and that it "'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)). This showing "can be made either through the use of direct evidence or circumstantial evidence." Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004).[12]

## i. Direct evidence[13]

A plaintiff produces direct evidence if the evidence is "sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on the plaintiff's age in reaching their decision." Id. In other words, a plaintiff "must produce evidence of discriminatory attitudes about age that were *causally related* to the decision to fire [him or] her." Id. (emphasis added). "Such evidence 'leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it' when he [or she] made the challenged

---

[12] The Supreme Court of the United States explained in Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343 (2009), that "a plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Id. at 2351. The Court noted that "[t]here is no heightened evidentiary requirement for ADEA plaintiffs to satisfy their burden of persuasion . . . ." Id. at 2351 n.4. Thus, it follows that this court may consider direct evidence, to the extent plaintiff offered such evidence, to determine whether that evidence creates a genuine issue of material fact concerning whether NWCT discriminated against plaintiff because of his age.

[13] At least one court of appeals recognized the conundrum courts face when considering direct and circumstantial evidence in a post-Gross world: "[I]t is conceivable that following Gross, McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)] may be found to apply to all age discrimination claims regardless of the evidentiary basis." Bartlett v. Gates, No. 09-3823, 2010 WL 4723786, at *4 n.2 (6th Cir. Nov. 15, 2010); but see Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985) ("[T]he McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination.").

employment decision." <u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335, 338 (3d Cir. 2002) (quoting

<u>Starceski v. Westinghouse Elec. Corp.</u>, 54 F.3d 1089, 1097 (3d Cir. 1995)).

"[S]tatements made by non-decision makers or by a decision maker unrelated to the

decisional process itself are *not* direct evidence." <u>Id.</u> at 513. Such "[s]tray remarks . . . are rarely

given great weight, particularly if they were made temporally remote from the date of the

decision." <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 545 (3d Cir. 1992); <u>see</u>

<u>Connolly v. Pepsi Bottling Grp., LLC</u>, 347 F. App'x 757, 761 (3d Cir. 2009) (supervisors'

comments did not "suggest potential age-related bias, and those that might were made months

before [the] defendant's decision to terminate [the] plaintiff and outside the context of that

decisionmaking process"); <u>Venter v. Potter</u>, 694 F. Supp. 2d 412, 425 (W.D. Pa. 2010).

In making an employment decision, an employer who relies upon the age-based

statements of an individual who was a participant, but not necessarily a decisionmaker, can be

held liable under the ADEA. <u>See id.</u> at 513-14. Under this "cat's paw" theory of liability, "an

employer can be liable where the formal decision maker did not harbor an unlawful motive to

terminate the employee."[14] <u>Root v. Keystone Helicopter Corp.</u>, No. 10-1457, 2011 WL 144925,

at *6 (E.D. Pa. Jan. 18, 2011) ( "cat's paw" liability exists when a biased employee "uses the

formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory action"); <u>see,</u>

---

[14] The Supreme Court of the United States recently articulated the historical underpinnings of the "cat's paw" theory:

> The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. <u>See</u> <u>Shager v. Upjohn Co.</u>, 913 F.2d 398, 405 (7th Cir. 1990). In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the money makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

<u>Staub v. Proctor Hosp.</u>, 131 S. Ct. 1186, 1190 n.1 (2011).

e.g., Staub v. Proctor Hosp., 131 S. Ct. 1186, 1193 (2011) (with respect to termination subsequent to an employer's inquiry, "if the [employer's] independent investigation relies on facts provided by the biased supervisor – as is necessary in any case of cat's-paw liability – then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor").

Plaintiff offers, as direct evidence of age-based discrimination, Steim's statement made to him on or about September 13, 2007, that plaintiff was getting "older" and "forgetful." There are two reasons why this court cannot find Steim's statement rises to the level of direct evidence, i.e., evidence sufficient to allow the jury to find that the NWCT placed a substantial negative reliance on the plaintiff's age in reaching its decision.

First, plaintiff did not point to any evidence demonstrating that Steim's statement was causally related to the decision to terminate his employment. See Glanzman, 391 F.3d at 512 (requiring a causal link). Tellingly, the comment was made approximately nine months prior to plaintiff's termination and outside the context of any discussion concerning plaintiff's continued employment at NWCT. There is no evidence that *links* Steim's age-related statement in 2007 to his termination in 2008. Second, there is no evidence that suggests Steim influenced Kiefer or the JOC in the decision to terminate plaintiff's position in June 2008 to support a "cat's paw" theory. The court cannot discern from the evidence of record that Steim attempted in 2008 to induce Kiefer or the JOC to terminate plaintiff based upon her alleged discriminatory animus toward plaintiff. Similarly, there is no evidence to support a conclusion that Kiefer or the JOC relied upon Steim's 2005 or 2007 statements or advice with respect to Henry or his position when they decided in 2008 to terminate the TSC position. Because a statement made by a decisionmaker unrelated to the decisional process itself cannot be considered direct evidence, the

court concludes that a reasonable jury could not find that Steim's statement in 2007 creates a genuine issue of material fact for trial.

### *ii. Indirect evidence – McDonnell Douglas burden-shifting framework*

In ADEA cases where there is no direct evidence of discrimination, the Court of Appeals for the Third Circuit continues to apply the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[15]  See Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009) ("[T]he but-for causation standard required by Gross does not conflict with our continued application of the McDonnell Douglas paradigm in age discrimination cases."). The McDonnell Douglas framework requires a plaintiff alleging age discrimination to first establish a prima facie case of discrimination.  The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's [termination]."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  In so doing, "the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'"  Id. (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

"[O]nce the employee establishes a prima facie case [of discrimination], the burden of production (i.e., of going forward)[, but not the burden of persuasion], shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision."  Smith, 589 F.3d at 691.  The employer's burden is "relatively light," which can be

---

[15] In a RIF case, like the case *sub judice*, courts apply the McDonnell Douglas framework.  Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006).  The court of appeals in Tomasso explained that "[i]n ordinary times, employees are fired for poor performance; in a RIF, even qualified employees are laid off in order to reduce personnel."  Id.  The court cautioned, however, that "even in a genuine RIF (one that is motivated on a programmatic level by economic concerns), individuals may not be selected for layoff on the basis of age[; rather, t]he employer must have age-neutral reasons for deciding to lay off certain employees, and the employee can challenge these reasons as pretextual."  Id.

satisfied "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

"If the employer makes that showing, the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual." Smith, 589 F.3d at 691. In ADEA cases, the plaintiff has the ultimate burden of proving, by a preponderance of the evidence, that age was the "but-for" cause of the challenged employer decision. See Gross, 129 S. Ct. at 2351; Smith, 589 F.3d at 691.

### a. Prima facie case

To establish a prima facie case for age discrimination in a RIF context, the plaintiff must show that (1) he is age forty or older; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the employer retained employees who do not belong to the protected class. Simpson, 142 F.3d at 644; Tomasso v. Boeing Co., 445 F.3d 702, 706 n.4 (3d Cir. 2006). As part of the fourth element, the plaintiff must show "that the employer retained a sufficiently younger similarly situated employee." Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 301 (3d Cir. 2004); accord Anderson v. CONRAIL, 297 F.3d 242, 250 (3d Cir. 2002). Otherwise, the ADEA would operate to guarantee "a protected employee a job at the expense of a sufficiently younger employee." Anderson, 297 F.3d at 250.

To qualify as similarly situated, there must be evidence that the retained employees had duties that were *comparable* to those of the plaintiff. Monaco, 359 F.3d at 305; Anderson, 297 F.3d at 250. Courts analyzing the fourth prong must "look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace. This determination requires a court to undertake a fact-intensive inquiry on a case-

by-case basis rather than in a mechanistic and inflexible manner." Monaco, 359 F.3d at 305. The Court of Appeals for the Third Circuit noted, in the context of a Title VII complaint, that "'a plaintiff whose employment position is eliminated in a corporate reorganization or work force reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons.'" Hook v. Ernst & Young, 28 F.3d 366, 375 (3d Cir. 1994) (quoting Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 517 (6th Cir. 1991)).

NWCT does not dispute that plaintiff satisfied the first three elements of his prima facie case for age discrimination. NWCT asserts that plaintiff failed to satisfy the fourth prong because he did not produce any evidence demonstrating NWCT retained a sufficiently younger similarly situated employee to permit an inference of age discrimination.

To satisfy the fourth prong of his prima facie case, plaintiff does not identify one sufficiently younger similarly situated employee who was retained by NWCT. Plaintiff's duties were handling software and hardware services for computers and printers. Notably, those job duties were outsourced to third-party vendors after the TSC position was eliminated. Plaintiff did not have a supervisory role during his employment. The younger employees plaintiff points to held positions unrelated to technology services. Those employees included teachers, a culinary aide, a cosmetology instructor, and front office personnel. The record also does not indicate the ages of those individuals – only that they were "younger" than plaintiff. The employee with technology duties – albeit teaching duties – was Jennifer Nix ("Nix"), a computer application teacher. There is no evidence to suggest she was *younger* than plaintiff. See Monaco, 359 F.3d at 305-07 (affirming the district court's entry of summary judgment in the employer's favor when the plaintiff did not demonstrate that the employer retained any employees who were sufficiently younger *and* similarly situated). Under those circumstances no

reasonable jury could find NWCT retained any employee who had comparable duties. Because plaintiff failed to satisfy the fourth prong of his prima facie case for age discrimination under the ADEA, summary judgment must be granted in favor of NWCT with respect to that claim and the remainder of the McDonnell Douglas framework need not be addressed.

### *2. Title VII*

Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual . . . , because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Unlike ADEA plaintiffs,

> [a] Title VII plaintiff may state a claim for discrimination under either the pretext theory set forth in McDonnell Douglas . . . or the mixed-motive theory set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989), under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons.

Makky v. Chertoff, 541 F.3d 205, 213 (3d Cir. 2008).

### *i. Mixed-motives analysis – Price Waterhouse*

Under a mixed-motives inquiry, the Supreme Court of the United States explained in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), that "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" Id. at 101. If a plaintiff makes that showing, the employer can put forth an affirmative defense to "demonstrate that it would have taken the same action in the absence of the impermissible motivating factor." Id. at 95 (alterations omitted). "If proven, this defense limits the plaintiff's relief to injunctive relief, attorney's fees, and costs." Makky, 541 F.3d at 213. While a mixed-motives analysis does not require the plaintiff to put forward direct evidence, Desert Palace, 539 U.S. at 92, the plaintiff generally presents evidence of "'conduct or statements by persons

involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude.'" Stackhouse v. Pennsylvania State Police, No. 01-2223, 2006 WL 680871, at *4 (M.D. Pa. Mar. 14, 2006) (quoting Griffiths v. CIGNA Corp., 988 F.2d 457, 470 (3d Cir. 1993), *overruled on other grounds by* Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir. 1995)).

Plaintiff argues that Steim's statement to Redemer in 2005 is evidence directly reflecting her alleged discriminatory attitude toward his gender. Redemer testified that, during a conversation with Steim about wages in the fall of 2005, Steim stated it was her opinion that "your wage is based on if you have a penis or not." (C.S. ¶¶ 74, 76; Redemer Dep. at 6.) Redemer opined that, in the context of their conversation, Steim's comment related to women not earning equal pay for equal work compared to their male counterparts because of their gender. Redemer and Steim were the only individuals present in the room during the conversation, and Redemer testified he did not believe Steim discriminated against male employees.

Steim's comment to Redemer in 2005 is a stray remark that has no causal relationship to plaintiff's termination. Under those circumstances, that remark is not sufficient evidence of a motivating factor for the termination. Steim made her comment to Redemer approximately two-and-a-half years before plaintiff's employment was terminated. The record does not indicate that the statement was related to plaintiff in any way, or that decisionmakers relied upon that statement in making their determination to terminate the TSC position. Steim's statement, and the context in which it was made, was so far removed from the circumstances surrounding plaintiff's termination that the court cannot discern any causal relationship. Because a reasonable jury could not find that plaintiff presented sufficient evidence to demonstrate that

Steim's statement was a motivating factor in his termination, the court will not proceed under the mixed-motives analysis. The parties' remaining arguments with respect to gender discrimination under Title VII are pursued under the <u>McDonnell Douglas</u> framework and will be addressed by this court with that framework in mind.

### *a. Prima facie case*

To state a claim for gender discrimination under Title VII where a plaintiff is terminated in a RIF, the plaintiff must show by a preponderance of the evidence that he: (1) is a member of the protected class; (2) was qualified for the position; (3) was discharged; and (4) persons outside of the protected class were retained. <u>Rhett v. Carnegie Ctr. Assocs.</u>, 129 F.3d 290, 294-95 (3d Cir. 1997). Under the fourth element, the Court of Appeals for the Third Circuit applies the "similarly situated" requirement with equal force to Title VII cases as it does to ADEA cases. <u>See</u> <u>Lepore v. Lanvision Sys., Inc.</u>, 113 F. App'x 449, 452 (3d Cir. 2004) ("In a reduction in force case, the persons outside the protected class are those employees who are "similarly situated," that is, they work in the same area in approximately the same position.").

NWCT argues that, assuming the first three elements of plaintiff's prima facie case are satisfied, there is no evidence that would permit an inference of age-related discrimination to satisfy the fourth element. In response, plaintiff alleges that certain male teachers were fired for various reasons, and female employees were treated more favorably than plaintiff. Henry's argument misses the mark because it fails to address, in a meaningful way, his prima facie case of gender discrimination. Nix – the computer applications teacher – was the only employee whose position related to computers. Plaintiff did not address how Nix's job duties, or the duties of any other female employee, were comparable to his own. There is no evidence concerning Nix's salary, duties, or other factors relevant in determining whether she was similarly situated to

plaintiff. Tellingly, Nix was a teacher at NWCT, a fundamentally different position than the technology services coordinator; there is no evidence that teaching students was a function of plaintiff's job as a TSC. The remaining steps in the <u>McDonnell Douglas</u> burden-shifting framework need not be addressed because there is insufficient evidence of record to show a similarly situated person outside plaintiff's class was retained.

Because no reasonable jury could find that plaintiff satisfied his prima facie case for gender discrimination under Title VII, summary judgment must be granted in NWCT's favor with respect to that claim. <u>See</u> <u>Wood v. Univ. of Pittsburgh</u>, 395 F. App'x 810, 814 (3d Cir. 2010) (in an age-based discrimination case under Title VII, the Court of Appeals for the Third Circuit affirmed the district court's grant of summary judgment in the defendant's favor because "the record [wa]s devoid of evidence which satisfie[d] the final element" of the prima facie requirements).

## *IV. Conclusion*

NWCT's motion will be granted in its entirety because plaintiff failed to adduce sufficient evidence to show that in its RIF, the employer retained a sufficiently younger person or someone outside the protected class who was similarly situated. An appropriate order will follow.

<u>/s/ JOY FLOWERS CONTI</u><br>
Joy Flowers Conti<br>
United States District Judge

Date: March 25, 2011